# YOUNG v. WATERS-PIERCE OIL COMPANY, Appellant.

### Division Two, January 31, 1905.*

1. **NEGLIGENCE: Contractual Relation: Injury To Third Parties.** An oil company which runs a pipe from its stationary tank on the right-of-way of a railroad so dangerously close to passing cars that an employee of the railroad rightly on the car in the due performance of his duties is knocked off as the car passes by, is liable for his consequent injuries, as for negligence. Its liability is not to be determined by the fact that no contractual relations existed between it and him, but by the fact that the oil company was negligent in maintaining the pipe in a position dangerous to an employee of the railroad.

---

*Decided December 24, 1904; motion for rehearing filed; motion overruled January 31, 1905.

2. ———: **Injury to Third Parties: Duty of Defendant.** An oil company that runs a two-inch metallic pipe from its stationary tank so close to a railroad track that the employees of the rail-road, in the performance of their duties on passing cars, are liable to be struck by such pipe, is bound to know that they are liable to be so struck and owes them the duty not to imperil their lives.

3. ———: ———: **Consent: Duty of Railroad: Safe Place to Work: Excuse.** If an oil company places a two-inch pipe so close to the passing cars of a railroad as to endanger the lives of the trainmen by knocking them off, it is no less liable than if it had done so by the consent of the railroad company; and if it obtained such consent, both it and the railroad company are liable for the consequent injuries to an employee of the railroad in the due exercise of his duties on the cars. The fact that the railroad company owes its employees the duty not to subject them to such a dangerous obstruction in no manner excuses the oil company for creating the dangerous obstruction with the consent of the railroad company.

4. ———: ———: **Extent of Liability.** In all cases in which any person undertakes the performance of an act, which, if not done with care and skill, will be highly dangerous to the persons or lives of one or more persons, known or unknown, the law, *ipso facto*, imposes, as a public duty, the obligation to exercise such care and skill, and a failure to do so is negligence, and redress will not be withheld from an innocent person in the exercise of due care who has received injury as a result of such neglect.

5. ———: ———: **Contributory Negligence: Question for Jury.** The conductor on a railroad train, while on the ladder of a freight car, was struck by a small metallic pipe which extended within five inches of passing cars, and was suspended in the air, by an oil company that had so constructed it to convey oil from its stationary tank to cars. The pipe could not be seen by a man on the car with two cars ahead of him in the moving train, which was the conductor's position, and the curves in the track were calculated to deceive him as to the proximity of the pipe to the track. The conductor had been told to look out for the pipe, but he had been in the employ of the railroad along that line only seven days, and it does not appear that he ever saw it. And while on the ladder in the perilous work of uncoupling cars, he was knocked off as the car passed the end of the pipe. *Held*, that whether he was guilty of such contributory negligence in taking the dangerous position on the ladder as would preclude his wife from recovering for his fatal injuries, was a question for the jury.

Appeal from Bollinger Circuit Court.—*Hon. Jas. D. Fox*, Judge.

AFFIRMED.

*Johnson & Richards* and *George H. Williams* for appellant.

(1)   Knowing of the presence of the pipe and its danger, and beginning his employment with such knowledge, and continuing to work under such condi- tions, Young waived the danger and assumed the risk of the employment.   Junior v. Elec. Light Co., 127 Mo. 83; Nugent v. Milling Co., 131 Mo. 245; 2 Thom. Neg., 1008; Thompson v. Railroad, 109 Mo. 199; Rob- erts v. Tel. Co., 166 Mo. 379; Doyle v. Trust Co., 140 Mo. 1.   It is true, as held in this State, that the mere fact that the servant has notice of the defect, and, notwithstanding, continues his employment, may not charge him with contributory negligence or the assump- tion of risks so as to defeat his recovery for injuries suffered by reason of such defect, but it is equally true and settled in this State that if it appears that the ser- vant not only had notice of the defect, but knew or might have known in the exercise of ordinary common sense and prudence, the danger to himself from such defect, he is held by continuing his employment to have assumed the risk.   The court makes a distinction be- tween the knowledge of a defect and the knowledge of the danger.   Doyle v. Trust Co., supra; Halloran v. Iron and Foundry Co., 133 Mo. 470; Wray v. Electric, etc., Co., 68 Mo. App. 380; Booth v. Air Line, 76 Mo. App. 516; Winkler v. Basket Co., 137 Mo. 394; Lacey v. Oil Co., 129 Mo. 32; Lovejoy v. Railroad, 125 Mass. 79; Bellows v. Railroad, 157 Pa. St. 51; Murphy v. Railroad, 115 Mo. 125; Wood v. Locke, 147 Mass. 605. (2)   The deceased was guilty of such contributory neg- ligence as to bar a recovery by the plaintiff in this

case. His act was almost suicidal. The court refused an instruction for a nonsuit in the face of convincing testimony. Murphy v. Railroad, 115 Mo. 125; Walkin v. Lumber Co., 86 Me. 191; Roble v. Railroad, 35 Minn. 84; Wheat v. St. Louis, 179 Mo. 572.

*Moses Whybark, Ralph Wammack* and *N. A. Mozley* for respondent.

(1) Defendant erected and maintained the pipe on the right-of-way of the railroad without regard to any degree of care, precaution or vigilance for the protection of the employees of the railway company, whose duties, in managing and operating moving trains, defendant knew compelled them many times daily to pass the end of the pipe, and that in doing so they would be constantly exposed to the danger of being injured by it. Under the facts of this case defendant was guilty of a manifest breach of duty to plaintiff's husband, and his coemployees who might have been injured by the pipe while performing their ordinary duties on the trains, and it is liable in this action for the death of her husband. Roddy v. Railroad, 104 Mo. 234; Geissman v. Elec. Co., 173 Mo. 654; Erslew v. Railroad, 49 La. Ann. 86; Ella v. Boyce, 70 N. W. 1106; Elevator Co. v. Lippert, 11 U. S. C. C. App. 521, 63 Fed. 942; VanWinkle v. Steam Boiler Ins. Co., 19 Atl. 472; Railroad v. Snyder, 55 Ohio St. 361; Railroad v. Miles, 24 U. S. C. C. App. 559; Elec. Co. v. Garden, 23 U. S. C. C. App. 649; Giraudi v. Elec. Co., 107 Cal. 120, 28 L. R. A. 596; Perhem v. Elec. Co., 33 Ore. 451, 40 L. R. A. 799; Haynes v. Gas Co., 114 N. C. 203, 26 L. R. A. 810; Sykes v. Railroad, 77 S. W. 723; Griffin v. Elec. Co., 164 Mass. 492, 32 L. R. A. 400; Clements v. Elec. Co., 44 La. Ann. 692, 16 L. R. A. 43; Illingsworth v. Elec. Co., 161 Mass. 583, 25 L. R. A. 552; Railroad v. Dignan, 56 Ill. 487; Railroad v. Frelke, 110 Ill. 498; Dowell v. Guthrie, 99 Mo. 652; Conway v. Reed, 66 Mo. 346;

Lynds v. Clark, 14 Mo. App. 74; 21 Am. and Eng. Ency. Law (2 Ed.), pp. 460, 461, 462, 467, 470, 471. (2) (a) It is not necessary that a contractual relation should exist between the parties, nor that the injury should be one resulting from the violation of a duty owing to the general public. Whenever a person should reasonably apprehend that, as the natural and probable consequences of his act or neglect, another will be placed in a situation of danger of receiving injury, a duty of exercising due care to prevent such injury arises. And if the injury results from the failure to use such care, a liability to the person injured exists in the absence of any other controlling fact. Railroad v. Snyder, supra; Ella v. Boyce, supra; Elevator Co. v. Lippert, supra; VanWinkle v. Steam Boiler Ins. Co., supra; Rupard v. Railroad, 88 Ky. 280, 7 L. R. A. 316; Moon v. Railroad, 46 Minn. 109; Burkhart v. Schott, 74 S. W. 430; Roddy v. Railroad, 104 Mo. 234; Lampert v. Gaslight Co., 14 Mo. App. 376; Geissman v. Elec. Co., 173 Mo. 654. (b) That the consequences which might result from the act were not foreseen is no excuse. If injury might reasonably have been anticipated, or the occurrence of the injury would not in the minds of reasonable men be in the highest degree unlikely, the defendant is answerable for the negligent act. Quill v. Tel. Co., 34 N. Y. Supp. 471; State ex rel. v. Finn, 87 Mo. 316; Miller v. Railroad, 90 Mo. 394; Banks v. Railroad, 40 Mo. App. 464; Graney v. Railroad, 140 Mo. 98; Railroad v. Carlin, 49 U. S. C. C. App. 609; Doyle v. Railroad, 77 Iowa 607, 4 L. R. A. 420; 21 Am. and Eng. Ency. Law (2 Ed.), 486, 487; Railroad v. Locke, 112 Ind. 417. (c) And whether the consequences of the act of the defendant in erecting the pipe so close to the track of the railroad as to endanger the employees on trains ought to have been foreseen by it, was a question for the jury, and the court properly submitted it to them by instruction 2, given on request of plaintiff. Lillibridge v. McCann, 117 Mich. 84, 41

L. R. A. 381; Quill v. Tel. Co., supra. (d) Defendant had obtained from the railway company a special privilege in the use of a portion of its right-of-way, to be enjoyed by it at Bloomfield, and it thereupon became its duty to use especial care in the exercise of that privilege towards the train employees of the railway company performing the train service plaintiff's husband did. Chicago v. Robbins, 67 U. S. 418, 17 L. Ed. 303; Reedy v. Brewing Assn., 161 Mo. l. c. 533. (3) The defendant by using that part of the right-of-way of the railway company over which the pipe reached, and ended near the track, in the manner it did, owed them the same duties the railroad company owed its own employees in working at and about the pipe. Roddy v. Railroad, 104 Mo. 250; Martin v. Railroad, 95 Ky. 616; Railroad v. Frelke, 110 Ill. 502; Sullivan v. Railroad, 23 Ill. App. 646; McMarshall v. Railroad, 80 Iowa 762; Robertson v. Railroad, 160 Mass. 193. (4) The fact that the railway company was guilty of negligence in permitting the defendant to negligently erect an obstruction on its right-of-way dangerous to its train employees, and permitting it to remain in that condition, does not excuse defendant for negligently erecting and maintaining the obstruction. Both the railway company and defendant were liable for any injury received by reason of the negligence, and plaintiff could sue both or either as she saw fit. Newcomb v. Railroad, 169 Mo. 422; Taylor v. Railroad, 137 Mo. 369; Benjamin v. Railroad, 133 Mo. 291; Waller v. Railroad, 59 Mo. App. 410; Pratt v. Railroad, 77 N. W. 1066; Quill v. Tel. Co., 34 N. Y. Supp. 470; Hunt v. Railroad, 14 Mo. App. 160; Railroad v. Chambers, 15 U. S. C. C. App. 332; Railroad v. Cummins, 106 U. S. 700, 27 L. Ed. 267; Railroad v. Land Co., 17 L. R. A. 35; 21 Am. and Eng. Ency. Law (2 Ed.), pp. 495-96. Where two causes combine to produce injuries defendant is not relieved of liability because it is responsible for only one of such causes. Newcomb v.

Railroad, 169 Mo. 422; Board of Com'rs v. Mutchler, 36 N. E. 534. And all parties guilty of the act are liable, and may be sued either jointly or severally. Ice Machine Co. v. Keifer, 10 L. R. A. 699; Stanley v. Railroad, 114 Mo. 606. (5) But for the close proximity of the end of the pipe to the track of the railroad the death of plaintiff's husband would not have occurred; defendant's negligence in thus erecting and maintaining the pipe was the proximate cause of the injury. Lore v. Mfg. Co., 160 Mo. 625; Reed v. Railroad, 50 Mo. App. 504; The Joseph B. Thomas, 30 U. S. C. C. App. 338; Dickson v. Railroad, 124 Mo. 149; Railroad v. Kellogg, 94 U. S. 460, 24 L. Ed. 259; 21 Am. and Eng. Ency. Law (2 Ed.), pp. 485, 486. (6) The pipe was erected, used and maintained by the defendant, and was a nuisance on the right-of-way of the railroad company, dangerous to the train employees performing their ordinary duties requiring them to be on the cars, and even though the railway company is liable the defendant as lessee is also liable. 18 Am. and Eng. Ency. Law (2 Ed.), 243, 244, 257, 258, 259; 21 Am. and Eng. Ency. Law (2 Ed.), 719; Buesching v. Gaslight Co., 73 Mo. 219; Grogan v. Foundry Co., 87 Mo. 327; Carvin v. St. Louis, 151 Mo. 347; Gordon v. Peltzer, 56 Mo. App. 602; Gilliland v. Railroad, 19 Mo. App. 411; Stanley v. Railroad, 114 Mo. 623. (7) The American Mortality Tables as contained in volume 2 of the Revised Statutes of 1879, and introduced by plaintiff, were competent evidence. 2 R. S. 1879; Boetger v. Iron Co., 136 Mo. 531; O'Mellia v. Railroad, 115 Mo. 203; 20 Am. and Eng. Ency. Law (2 Ed.), 883, 884, 885; 8 Am. and Eng. Ency. Law (2 Ed.), 940j. And also the number of children left by deceased. O'Mellia v. Railroad, 115 Mo. 222; Soeder v. Railroad, 100 Mo. 682; Schlereth v. Railroad, 115 Mo. 102; Tetherow v. Railroad, 98 Mo. 87; 8 Am. and Eng. Ency. Law (2 Ed.), 940k.

GANTT, P. J.—This is an appeal from the circuit court of Bollinger county. Plaintiff, as the widow of Robert Young, recovered judgment for damages resulting to her from the death of her husband, who, it is alleged, was killed by reason of the negligence of the defendant at Bloomfield, Missouri, January 31, 1901.

The action was commenced within six months after the death of the husband. On the ninth of September, 1901, she filed an amended petition, containing three counts, which are the same save and except that the first count alleges that the death of the deceased resulted from all the injuries he received in the accident; the second, that his death was caused by internal injuries then received; and the third, that it was caused by the injuries to his legs. The petition in substance states that plaintiff is the widow of Robert Young; that the Cape Girardeau, Bloomfield, and Southern Railway Company is and was at the time of said injuries a railroad corporation existing under the laws of this State, and owned and operated a railroad from Zalma, in Bollinger county, to Brownwood, in Stoddard county, thence to Bloomfield, and from thence to a connection with the St. Louis, Southwestern Railroad at Zeta, in Stoddard county; that the defendant is, and was prior to and at the time of the alleged wrongful acts, a corporation organized under the provisions of article 9 of chapter 12 of the Revised Statutes of Missouri, and the general purposes of said corporation are dealing in naval stores and dealing in compounding petroleum and other oils and products thereof and buying and selling the same in Missouri and elsewhere; that said defendant corporation had and usually kept at the date of the institution of this suit and still keeps at Lutesville in Bollinger county, an office and agent for the transaction of its usual and ordinary business.

The substantive averments of the facts showing

the relation of the parties and the negligence complained are as follows:

"That at the city of Bloomfield aforesaid, in or about the year 1900, the particular date the plaintiff is unable to state, there was erected and built a large tank on the west side of the track of said railroad and distant therefrom about fifty-one feet; and also at about the same time at the place aforesaid, and near to said tank, and used in connection therewith, there was erected and built a building. That on the thirty-first day of January, 1901, and for a long time prior thereto, the said tank was used and operated by the defendant for a receptacle for oil; and said building was used by said defendant in connection with said tank.

"That in the latter part of the year 1900, the particular date the plaintiff is unable to state, the defendant erected a metal pipe of about two inches in diameter, connecting the said building with said tank, and reaching from the said tank to the said building, and from said building on towards said railroad, and above the ground, and ending near the west side of the track of the main line of said railroad at a height of about eleven and a half feet above the top of the west rail and on the right-of-way of the said railway company. That said pipe was erected, maintained and used by the said defendant for a conduit to convey oil from cars on said railroad, loaded with oil, to the said tank; or if occasion required, to convey oil from the said tank to the cars on the said railroad.

"That the end of said pipe was fixed by defendant in a stationary position, and was erected by defendant so close to the west side of the track of said railroad as to be dangerous to the servants and employees of said railway company on its cars, and trains of cars while engaged in the performance of their ordinary duties in operating and managing the same in passing over said railroad, and by the end of said pipe; and which cars and trains of cars operated and managed

by them, would have to and did, daily pass over said railroad, and in doing so would daily have to, and did pass by the end of said pipe; all of which defendant well knew, or by the exercise of ordinary care might have known, yet the said defendant negligently and carelessly so erected said pipe, and after having negligently and carelessly so erected it, negligently and carelessly maintained and kept the same in that same dangerous condition to the servants and employees of said railway company engaged in managing and operating its cars, for a space of time of more than two months continuously, and immediately next before the thirty-first day of January, 1901, without any alteration or change in its dangerous nature or character, to them, the servants and employees aforesaid.

"That on the thirty-first day of January, 1901, and for a short time prior thereto, the said Robert Young, plaintiff's said husband, was an employee of said railway company as a conductor on its cars and trains of cars, at a salary of forty dollars per month; and as such conductor it was his duty to manage and assist in the operation and movement of cars and trains of cars of said railway company running over and upon its said railroad. That at the city of Bloomfield, aforesaid, on the thirty-first day of January, 1901, while he, the said Robert Young, was engaged in the discharge of his duties as such employee of said railway company, and was descending from the top of a car of the train of cars of said railway company, moving north on said railroad, and of which trains of cars he was conductor, down a ladder of said car, and on its then west side, and while he was on said ladder and in the act of descending the same the said car passed the end of said pipe, and he was then and there, by reason of the closeness of the said end of the said pipe to the railroad track, and to the side of the car he was on, struck by the said pipe, and thereby knocked from the said ladder and from the said car, and thrown by the force

of said knock on the track of said railroad, and between the car he was on and another moving car attached thereto and then immediately next to the car he was on, and was then and there run over by the said last-named car and both of his legs thereby broken and crushed, and the flesh thereof bruised, mangled and lacerated, and he then and there and thereby received other great bodily internal injuries in his abdomen, the particular character of which are unknown, and for that reason plaintiff is unable to more particularly describe them, and in consequence of said injuries so received by him as aforesaid, he died on the thirty-first day of January, A. D. 1901, at the city of Bloomfield aforesaid.

"That the said injuries so received by the said Robert Young and which caused his death as aforesaid, were caused by the negligence and carelessness of the said defendant in negligently and carelessly erecting and maintaining the end of the said pipe so close to the west side of the track of the said railroad as to be dangerous to the servants and employees of said railway company on its cars and trains of cars, engaged in the performance of their ordinary duties in operating and managing the same, in passing over the said railroad and by the end of said pipe as aforesaid."

The answer contained a general denial; a plea that defendant neither at the time of the alleged accident nor at any other time had any possession or control of that part of the right-of-way or roadbed of said railroad where said accident occurred and had no authority or control in the management of said railroad or in the running and operating of trains and cars thereon; and, third, a plea of contributory negligence on the part of the said Robert Young. To which the plaintiff filed the following reply:

"Now comes the plaintiff, by her attorney, and for her replication to the new matter set up by defendant in its answer, denies that said defendant did not at

the time of the alleged injury to her husband have the possession of that part of the right-of-way of the Cape Girardeau, Bloomfield and Southern Railway Company where the said injury occurred as alleged in the petition, nor any part thereof; but plaintiff avers that defendant erected said pipe on the right-of-way of the said railway company, and maintained and controlled the same at the time of said injury to her husband, and had maintained and controlled the same for more than two months prior thereto, as alleged in the petition. That defendant was granted by said railway company the privilege to erect and maintain a pipe on its right-of-way at the city of Bloomfield for the purposes mentioned in the petition, and in accordance with said privilege it erected the pipe in question for said purposes as alleged in the petition, but negligently and carelessly erected the same so that one end thereof was so close to the track of the railroad of said railway company as to be dangerous to its employees engaged in the performance of their duties in managing and operating its cars and trains of cars passing over said railroad, and by the end of said pipe as alleged in the petition; that although the said railway company, prior to the injury to plaintiff's husband, and in ample time for defendant to have placed said pipe in a condition of safety to her husband and the other said employees of said railway company, before the said injury, had notified and advised defendant of the said dangerous nature and character of the said end of said pipe, as erected by defendant, to its servants and employees engaged in their duties on its cars and trains of cars, as alleged in the petition, and demanded that defendant remove the same far enough away from the track of its road, so as to be safe as to them, its employees as aforesaid, the defendant neglected and failed to do so, but maintained, used and controlled it in the same dangerous condition, as alleged in the petition.

"For further replication to the new matter set up

in the answer she denies all and singular each and every allegation therein contained or any knowledge or information sufficient to form a belief thereof, and again prays for judgment as she had heretofore done in the petition.''

The testimony developed the following facts:

''The railway company owned and operated a railroad running from Zalma, in Bollinger county, to Bloomfield via Brownwood, in Stoddard county, and thence to a connection with the St. Louis, Southwestern Railroad at Zeta in Stoddard county. The distance from Zalma to Bloomfield is twenty-seven miles, and from Bloomfield to Zeta seven miles, making the total length of the road thirty-four miles. The trains would leave Bloomfield in the morning and go to Brownwood and on to Zalma, and return to Bloomfield, fifty-four miles; then between ten and eleven o'clock in the morning go from Bloomfield to Zeta, where the road connected with the Cotton Belt, and return fourteen miles, then in the afternoon go from Bloomfield to Brownwood and return, thirty-two miles; making a total run of 100 miles each day.

''The defendant is a corporation organized under article 9 of chapter 12 of the Revised Statutes 1899, and its purpose is dealing in naval stores, and dealing in and compounding petroleum and other oils and all products thereof, and buying and selling the same in Missouri and elsewhere.

''On November 21, 1900, the railway company leased defendant a portion of its right-of-way at Bloomfield, described as follows: Beginning at a point twenty feet west of the main track, then running westwardly thirty feet, then north 100 feet, then east thirty feet, then south 100 feet, being a plot thirty feet by 100 feet. This was rented to defendant for three years, defendant agreeing to place on the plot leased one or more oil tanks made of iron, and of an approved construction. The consideration on the part of the rail-

road company was $1 per year rental and especially on account of the business that would accrue to it by offering to the Waters-Pierce Oil Company additional and better facilities.

"Mr. H. S. Spence testified that he was an agent at Bloomfield for the defendant in the latter part of 1901 for the distribution of oil. That at first he kept oil for defendant in wooden and iron barrels, and about the first of September defendant shipped the first tank of oil to Bloomfield and during December, 1900, they erected a large tank on the right-of-way of the railroad, having a capacity of about 4,500 gallons. One tank had been emptied in December, and another tank was on the side track when deceased was killed, and had not been pumped out yet. There was a pipe running from the top of the oil house across from the tank on the car, and it ran down into the oil house, and there connected with a large pump, and was used to pump the oil out of the tank on the track to the stationary tank. The oil house is about twenty or twenty-five feet from the railroad track. The pipe was erected by the defendant.

"E. O. Biggs, a witness for defendant, testified that the north side of the oil house is seventeen feet nine inches from the west rail. That the post on which the pipe is attached is five feet seven inches from the west rail. The oil tank is north of the oil house about thirty-six feet. The post when first put up was about four feet from the track, and the railway company ordered it moved further away, and he had it moved to a distance of five feet seven inches. The pipe was not up then. The pipe was put up by the defendant on the fifteenth of December, 1900. The only way to unload the oil from oil tanks on the cars was to either connect the pipe with the tank on the cars, above or below, or else carry it off in buckets or barrels.

"Emile Sebastian, witness for plaintiff, testified that he was superintendent of the railroad. That the

tank and pipe were erected by the defendant on the right-of-way of the railroad under a lease from L. B. Houck, sometime in the latter part of November or first of December, 1900. The tank he thinks had a capacity of 5,000 or 6,000 gallons. The pipe was a metal one about two inches in diameter and fixed in a stationary position. There was no change made in the position of the pipe from the time it was put up until after deceased was injured. The end of the pipe was about twenty-four inches from the west side of the track of the railroad, and that would be about four inches from the west side of a moving box car. This he ascertained by measurement since the deceased was injured.

"Benjamin White, for plaintiff, testified that the pipe was placed there close to two months before the injury by defendant, and no change was made in the location of the end of the pipe from the time it was erected until the injury to deceased. It was about forty or fifty feet north of the north end of the platform of the depot on the west side of the main line, and about thirteen or fourteen feet high above the west rail, and about four inches from the west side, and on the level with the roof of an ordinary freight car, and about five inches from the car deceased was on. It extended to the oil house and from there to the tank, and was used for drawing oil from the tank on the car to the tank on the ground. The oil house was about fifteen or twenty feet from the car, and the oil tank about fifteen or twenty feet from the oil house. The oil house was use for holding oil for the railroad company, and the Waters-Pierce Oil Company.

"Joseph Haydock, a witness for plaintiff, testified that the pipe was erected by defendant about two months before the injury, and there was no change made in its position or condition from the time it was erected until the deceased was injured. It was connected with the oil house, and then to the tank, and from the oil house it went to the west side of the track about

ten feet above the ground. The road runs north and south there. It was about four inches from the west rail. He was shown photograph, and marked position of pipe, and the points north, south, east and west. It is about forty yards from the depot to the pipe. That end of the pipe was removed three or four days after the jury.

"For the purpose of showing that defendant recognized that it had control over the pipe, and for no other purpose, plaintiff asked the witness, Haydock, who removed the pipe. His answer was that he did not know, that he did not see it removed; that one joint was taken off, and this left it about three feet from the railroad track. Sebastian testified that after deceased was injured defendant moved the pipe back. That defendant erected the pipe by permission of the railroad company to unload oil from oil tanks. Mr. Spence testified that the change was made after the injury, by direction of a man by the name of Cohn, agent for defendant.

"Mrs. Young, the plaintiff, testified that her husband was thirty-five years old on April 4, 1900. That he died January 31, 1901. That she was thirty-three years old on June 1, 1901. That three children survived her husband. The oldest, a daughter aged twelve years on the fifteenth of May, 1901; the second, a boy, who was eight years old on the thirteenth of December, 1901; and the third, a girl, who was one year old on the sixteenth day of June, 1901. Her husband received $40 a month, but had only been employed by the railroad a few days. Haydock testified that the deceased was about five feet four or five inches in height, and weighed about 140 pounds.

"On January 31, 1901, the train left Bloomfield at four o'clock in the morning for Zalma, and was due back at 10:30. The train had been to Zalma, and returned, and was preparing for its trip to Zeta. They took the train down to the mill, which was about 200 or 300 yards south of the depot, for a carload of flour.

The train consisted of two box·cars (one C. B. & Q. car, used for baggage), and a passenger coach. The flour car was in the rear; the baggage coach in the middle, and the passenger coach ahead, when the train left the mill. The object when they left the mill was to switch and get the flour and baggage car ahead of the passenger coach and then go on to Zeta. The pipe is about ninety feet north of the depot, and the switch is still further north. This was between ten and eleven o'clock in the morning. North of the pipe five or ten feet is a small trestle. The crew of the train consisted of Haydock and White, brakemen; deceased, as conductor; and the engineer and fireman. About ten minutes before the injury, White asked deceased if they should take the train out as it looked, and he said, 'No, switch them.' He, White, then went inside of the baggage car, and was ready to cut the back car off. That he was in there awaiting for slack to cut the south car off. This was his position when the injury took place. Haydock was on the top of the flour car—the rear car— and deceased was on the top of the baggage car; the middle car in which White was. When they got to the depot they slowed up a little. Deceased asked Haydock if the brake was good, and he told deceased he would see, and deceased said, 'Well, I will cut them off,' and he started down the ladder, and by that time Haydock turned around and saw the pipe strike him. He did not see him get on the ladder, but he saw him going down, he had hold of the top round with his left hand when Haydock turned round, and had started down in the usual and ordinary way. He had his feet on the third round, and had hold of the top handhold when the pipe hit him. The pipe struck him on the side, a little below the shoulder, and threw him sideways with his body on the inside of the track, and threw him in between the car he was on and the last car, and he was run over by that car. Just as they passed over him, Haydock jumped down and went to him. He was

at the north end of the trestle, which was about ten feet from where the pipe had hit him. His right leg was crushed and his left leg and foot was crushed. The car had doors in each end and a ladder on the side at the north and south end, but on opposite sides. It could be uncoupled from the inside by White, but he would have to have slack. The usual way to uncouple a car was as deceased undertook to do it, by pulling a lever on the outside; the car could be uncoupled in that way while moving. Haydock was the only witness who saw the pipe strike deceased. White was inside the car reaching through the door waiting for slack to cut the car off, when deceased fell down past his arm; his head was on the inside of the rail, and his feet out. Koechig came that morning on the train from Zalma to Bloomfield, and deceased was conductor. He was standing near the track, and heard some one make an outcry, and looked and saw deceased falling off the car, and the rear car ran over him. He did not see the pipe hit him, and did not see him until after he was falling off the car.

"Dr. Evans testified that he amputated the legs of deceased, but in his opinion he died of internal injuries received in the accident. That he died on January 31, 1901, at Bloomfield, Missouri.

"Deceased had been in the employ of the railroad about seven days. Prior to that time he had been a freight train conductor on the Southern Missouri & Arkansas Railroad, and had been railroading about a year.

"Mr. Sebastian testified that he told Mr. Biggs, agent for defendant, when the pipe was erected, that it was too close to the track, and would have to be moved back, but no change was made. That by measurement, after the injury, he ascertained that the pipe was twenty-four inches from the west rail of the track of the railroad, and about four inches from the west side of a moving box car; that he testified before the

coroner's inquest in this case that there was a clearance of from eighteen inches to two feet, and that was his opinion then, but since then he has measured it and it is four inches. He was shown photograph and says it is a correct description of the track and grounds at the time of the injury except the pipe has been moved back, and illustrates the curves from the mill south of the depot to and beyond the switch north of the depot. That from the mill north beyond the switch there is a down grade of one and a half per cent grade and they moved along by there at from four to six miles an hour. Did not see deceased injured, but went to him a few moments afterwards and he was just north of the trestle. He describes the curves north of the depot, and south of the depot. If a person was standing at the mill and there was nothing in the way he could see the post, but with a train ahead of him, he could not by reason of the curve. A man standing on the back end with two cars ahead of him could not see it. At the depot the track made a reverse curve. At the depot the oil tank could be freely seen, but he does not think the pipe could. It could not be seen there with a train ahead. That a man standing on a car at the station with three cars ahead of him could not see the pipe, and the train would have to move forward about a car's length before he could see it, and then by reason of the curves he would be deceived in the distance. That by reason of the curves a man standing on the cars at the station looking towards the pipe could not very well see it until he gets right up to it. That the first day deceased came there, the witness told him to look out for that pipe; that it was too close, and he had notified Mr. Biggs to remove it, and if it struck him it would knock him off of the cars and kill him. He does not testify that he showed him the pipe or was ever with him at the pipe. That deceased was employed as a mixed train conductor, and it was his duty to get on top of these cars.

"White testified that they passed this pipe regularly six times a day, they did switching; that he never had any conversation with the deceased about the pipe. That the conductor's duties on this railroad were the same as brakeman's; that they had always done the same work since witness had been on the road.

"Haydock was shown the photograph, and testified that it was a correct description of the ground and surroundings, and marks the different points and directions and explains the curves. That deceased had been in the employ of the railroad for about a week, and had made six trips a day over the road, besides switching; that it was a clear day. That deceased would go on top of cars frequently, and had seen him up there, but he never had any conversation with him about the pipe. When standing at the mill the oil house can be seen, but he never noticed whether the pipe could be seen or not.

"The mortality tables as contained in the Revised Statutes of 1879, vol. 2, page 1165, as to the prospect of the life of a person of the age of thirty-four and thirty-five, also as to the life expectation of a person of the age of Mrs. Young at thirty-three and thirty-four, were introduced in evidence.

"The photograph, after having been explained by the witnesses, was introduced.

"E. O. Biggs explained the pipe and its location, and that he moved the post to which the pipe was attached back five feet seven inches from where it was first placed. This was done before the pipe was put up. On cross-examination he stated that the only way oil could be unloaded from tanks on the cars was by a pipe connected either above or below the tank, or carry it out in buckets."

The instructions will be noted in the course of the opinion.

I.    An able and exhaustive discussion of the doctrine of the assumption of risks as between master and

servant, employer and employee, has been indulged in by learned counsel for defendant, but they insist it is clear that there was no such contractual relation existing between defendant and Robert Young when he was killed, hence it is apparent that the doctrine of assumption of risks by an employee is not involved in this case. No such defense was pleaded, nor indeed would it have been appropriate to the facts developed on the trial. In justice to counsel for appellant they do not contend that the relation of master and servant existed between Robert Young and defendant, or that the decisions as to assumption of risks cited by them, strictly speaking, have any application to the facts of this case, save by analogy. Their proposition is that if the rule announced in the cases cited to the effect that if a servant capable of contracting for himself and with full notice of the risk he may run, voluntarily undertakes a hazardous employment or to place himself in a hazardous position or to work with defective tools and appliances, the master is not liable for injuries received from these known risks, obtains as between master and servant, *a fortiori*, it should be enforced when there is no such relation. In other words, as we understand the argument of counsel, they take the advanced position that there is neither in the petition nor evidence any such relationship shown between Robert Young and the defendant upon which to base any duty from defendant to Young; that whatever may be said of the duty of the railroad company in this connection, it can not be maintained that the duty devolved upon defendant to keep the pipe which was placed on the railroad right-of-way over which it had no control in such a position as not to be dangerous to the employees of the railroad company. This amounts, practically, to saying that unless a contractual relation exists between two parties, one of such parties can not recover for the negligence of the other simply because such negligent act is a breach of some contract with a third person;

that in this case it might be that the railroad company
was liable to its employee, Mr. Young, for permitting
defendant to place its pipe so dangerously near to its
track as to imperil the lives and limbs of its employees,
because a contractual relation existed between it and
its employees which bound it to furnish a reasonably
safe place in which to do their work, but that defend-
ant by virtue of the lease or license from the railroad
to put its pipes on its right-of-way, could with impun-
ity negligently place and maintain such pipe so close
as to be a constant menace to the lives of the employees
of said railroad and incur no liability if perchance one
of them was killed or injured by reason of the negli-
gent proximity of said pipe to the moving trains on
which said employees were required to do their work
for the railroad company, because there was no con-
tractual relation between the defendant and such em-
ployees. This insistence seems to be predicated largely
upon what was said by this court in Roddy v. Rail-
road, 104 Mo. 234. Indeed it is asserted that the Roddy
case can be paraphrased to fit the facts of this case.

It becomes important to determine whether the de-
cision in that case announces the doctrine here con-
tended for. In that case Pickle owned a quarry near
Warrensburg, Missouri, and also a switch connecting
said quarry with the Missouri Pacific Railroad. Under
a contract with Pickle the said railroad company fur-
nished him cars on his switch, and his employees loaded
them, and the railroad company then hauled them
away. Roddy was Pickle's employee, and had no con-
tractual relation with the railroad company, and it had
no control over him, but his duty was to load the stones
into the cars by means of a derrick near the quarry.
After the cars were set in on the quarry switch or
track, they were managed and controlled by the em-
ployees of Pickle, and, when necessary, it was Roddy's
duty to move the empty cars to a proper position to
load them. The grade on the quarry switch was de-

scending and brakes were necessary to hold the cars in position, or to control them while moving. On the date of the injury to Roddy, he was directed by Pickle to load a car with stone. Two flat cars stood upon the quarry track some distance from the derrick. Roddy got upon the north car, nearest the derrick, and found the brakes set. He walked on the top of the cars to the back end of the south car, and as he supposed, set the brake tight on that one. He then uncoupled the two cars, let the brake off the north car, set on the end of the south one and with his feet put the north car in motion. He then got down on the ground between the cars and with his hands, one on the drawhead, and the other on the end of the car, commenced pushing the north car to the derrick. While in this position the south car, by reason of defective brakes, ran upon him and injured him. He sued the railroad company for negligence. The contention was that the railroad company owed Roddy no duty by contract, and none by law except not to willfully injure him; that he could not avail himself of the contract between Pickle and the company. Responding to this contention, Judge MACFARLANE, for this court, said:

"Assuming that the contract between defendant and Pickle imposed upon the former the duty to supply the latter with cars provided with suitable brakes, and that there was a breach of that duty whereby plaintiff was injured, does the contract afford him indemnity for his injuries? The right of a third party to maintain an action for injuries resulting from a breach of contract between two contracting parties, has been denied by the overwhelming weight of authority of the State and Federal courts of this country and the courts of England. To hold that such actions could be maintained, would not only lead to endless complications in following out cause and effect, but would restrict and embarrass the right to make contracts by burdening them with obligations and liabilities to others, which

parties would not voluntarily assume.'' Farther on he says: ''Plaintiff [Roddy] not being a party to the contract [between Pickle and the railway company] can not maintain this action on account of injuries resulting from any breach of duty defendant owed Pickle, *arising purely out of the contract between them.* It is clear from the evidence that plaintiff was in no sense the servant of defendant. He was employed and paid. by Pickle, and was subject only to his control. Defendant had no authority over him, and had no. contract with him. The relation between plaintiff and defendant was not that of master and servant, and the rules peculiarly applicable to the duties and liabilities of one to the other have no application. Plaintiff shows no cause of action growing out of any duty defendant owed him, arising from the relation of master and servant. . . . What then was the true relationship between these parties, and what, if any, duty did the defendant owe to plaintiff as the employee of Pickle? . . . Under the evidence it is clear that what was to be done by the respective parties, under the contract, was for their mutual profit, and each was a contractor with the other, to perform a particular part of the work necessary to carry out the common purpose. . . . We think each of these contracting parties owed to the other, and his employees, the duty of properly discharging his part of the joint undertaking, in respect to any matter exclusively devolving on him. Pickle had nothing to do with providing or selecting the cars. That was entirely entrusted to the defendant. They were intended for the use of Pickle and his servants in discharging his part of the contract, and we think the obligation rested on the defendant to use ordinary care to provide such as would be reasonably safe for such use. . . . *While the relation of master and servant did not exist between these parties, defendant owed to plaintiff the observance of reasonable care in*

Vol 185 mo—42

*the selection of its cars for his use, which is the same degree the master is required to observe in providing his servants with instrumentalities for carrying on his business.''*

So that while Roddy was not allowed to recover by virtue of Pickle's contract with the company, it was not ruled that the railroad company owed him *no duty.* On the contrary it was specifically held that it owed him the observance of reasonable care in the selection of its cars for his use.

The other decision of this court relied on as settling this case for the defendant is Heizer v. Mfg. Co., 110 Mo. 605.

In that case the defendant sold a threshing machine, *not of its own manufacture,* and warranted it free of defects. The plaintiff's husband, a third party, was killed by the explosion of a defective cylinder in said machine. Judge BLACK, speaking for this court, held that was no privity of contract between the defendant manufacturing company and the deceased, and, therefore, that the defendant owed the deceased no duty *unless it knew,* when it sold the machine to the purchaser, of its defect, and failed to inform him of it. But, said this court, "Had the defendant sold this machine, knowing the cylinder was defective and for that reason dangerous, without informing him of the defect, then the defendant would be liable even to third persons not themselves in fault."

That the facts of this case differ widely from those in Heizer v. Mfg. Co., supra, is at once obvious.

Here the defendant itself constructed the metal pipe which knocked plaintiff's husband off of his train, and had been notified by the superintendent of the railroad, Mr. Sebastian, of its dangerous proximity to the track, and was ordered by him to move it back three feet, so that the erection of the pipe was not as in the Heizer case the negligent act of another of which it had no knowledge, but was its own act, and had been

notified of the danger amply long enough to have removed it back to a safe distance before the injury to plaintiff's husband. What then was and is the measure of defendant's duty to plaintiff upon the conceded facts of this case? A short review of some of the well-considered cases will show the state of the law on this question.

In Ella v. Boyce, 70 N. W. 1106, the following facts appeared in the Supreme Court of Michigan: The Michigan Trust Company at Manistee, Michigan, had charge of a salt block and saw mill. Connected with the saw mill and salt block was a tramway extending out into the lake, and terminating at a warehouse. The tram was used by the trust company in hauling barrels of salt from the salt block to the warehouse, which was done by a car drawn by one horse. The salt block was in operation day and night, and the car passed over the road every fifteen minutes, day and night. On each side of the tram was a row of spiles reaching from the shore to the warehouse, so that boats could tie up on either side without carrying their lines across the tram. The defendant moored his schooner at night to the tram, and caused a hawser to be extended over the tram and fastened to a spile on the opposite side. The plaintiff was an employee of the Trust Company, and his duty was to haul the salt on the car over the tramway, and while driving the car at night, and not knowing of the line on the tram, was caught by it, and seriously injured, for which he sued the defendant, the owner of the schooner. The defendant maintained that there was no duty owing by him to the plaintiff, and further no liability existed because there were no contract relations between him and the plaintiff. The court said: "It is contended by defendant that the declaration does not allege the existence or breach of any duty owing from the defendant to the plaintiff, or allege that the captain of the schooner knew or should have known of the existence of the tramway, or that it was in use

at the time. . . . We think the facts set out in the declaration clearly imply a duty on the part of the defendant not to have so carried his hawser across the track of the tramway as to cause injury to persons using it; and if the defendant sought to take advantage of such defect in the declaration, as not specifically averring the duty and the breach, he should have done so by demurrer. That question can not be raised for the first time in this court. . . .

"It is next contended that no liability exists, because there were no contract relations between the plaintiff and the defendant; in other words, that, in the absence of a contract, liability exists only when there is a public or imposed duty resting upon the defendant, and that no such duty is shown in this case. We can not agree with the learned counsel on this proposition. It was the duty of the owner of the salt block to have furnished the plaintiff with a safe place to work; and if the Michigan Trust Company, in whose employ the plaintiff was, had carelessly and negligently obstructed the way, and the plaintiff had been injured by such negligence, the employer would be held liable. The defendant here can not escape liability on the claim that no contract relation existed between him and the plaintiff to furnish a safe place. The right to recover does not depend on that condition. If the defendant strung the hawser across the tramway under authority from the Michigan Trust Company, his duties and responsibilities were coextensive with the Michigan Trust Company. If the defendant placed the hawser there without the consent of the Michigan Trust Company, his responsibility to the plaintiff for his injury would assuredly be no less than if he had obtained the consent."

Van Winkle v. American Steam Boiler Ins. Co., 19 Atl. 472, by the Supreme Court of New Jersey, is also a most instructive and well-reasoned case. The facts, briefly stated, were as follows: Van Winkle owned a

mill in Paterson, N. J., and near to it was a paper mill owned by the Ivanhoe Paper Mill Company, in which a steam boiler was so situated that if it exploded Van Winkle's mill would be damaged. The American Steam Boiler Insurance Company insured the paper mill company against damages that might be sustained by the explosion of its boiler, and while it did not obligate itself in the policy of insurance to make examinations and tests of the boiler, yet it reserved the right to do so if it pleased, and did exercise this privilege by making repeated inspections of the boiler, and furnishing certificates thereof for the guidance of the engineer of the paper mill company. The boiler exploded and injured Van Winkle's mill by reason of the failure by the insurance company to make the proper tests and inspections, and he sued the insurance company for its negligence in failing to make these inspections for the paper mill company. The question was whether the insurance company owed Van Winkle any duty growing out of its relations with the paper mill company. Chief Justice BEASLEY, among other things, said:

"It was the plain duty of the company (paper mill) to have it (the boiler) inspected at proper periods, and the case shows that, if that had been done, the calamity would have been avoided. That in this State of affairs an action would have lain against the Ivanhoe Company is indisputable." . . . That while the defendant insurance company was not compelled by the terms of the insurance policy to make the inspections of the boiler, but had only reserved the right to do so, yet "as it proceeded to do so, it thereby became bound by the express terms of its contract to disclose to the assurer 'any defect affecting the safety of the said boiler,' and to issue a certificate defining the load that could be put on the safety valve." . . . And that "the defendant, the insurance company, as soon as it took part, practically, in the management of this machine, became subject to a duty in that particular,

by virtue of its contract with the paper mill company, to conduct itself with care and skill and by virtue of the law to a similar duty towards the plaintiff; and it is the violation of this latter duty which, we think, forms a legal foundation for this action. And it would seem that there is a broader ground than the one above defined, on which the present case can be based. It is this: that in all cases in which any person undertakes the performance of an act which, if not done with care and skill, will be highly dangerous to the persons or lives of one or more persons, known or unknown, the law, *ipso facto*, imposes, as a public duty, the obligation to exercise such care and skill. The law hedges round the lives and persons of men with much more care than it employs when guarding their property, so that, in this particular, it makes every one, in a way, his brother's keeper; and, therefore, it may well be doubted whether, in any supposable case, redress should be withheld from an innocent person who has sustained immediate damage by the neglect of another in doing an act which, if carelessly done, threatens, in a high degree, one or more persons with death or great bodily harm. Such misfeasances, if they result fatally, are indictable crimes. When they inflict particular damage upon individuals, they should, it is conceived, be actionable.''

The chief justice pointed out that Winterbottom v. Wright, 10 Mees. & W. 109, and Collins v. Selden, L. R. 3 C. P. 495, were not in conflict with the views expressed, because in those cases the carelessness that was sought to be made actionable was not deemed by the court to be so dangerous as to have put upon those guilty of such carelessness any public duty whatever.

In the latter case it was said by WILLES, J., that the declaration should have shown either that the chandelier which fell on plaintiff was a dangerous thing in itself and likely to do damage, or that it was so hung

as to be dangerous to persons frequenting the public house.

Again in Crane Elevator v. Lippert, 11 U. S. Cir. Ct. App. 521, it appeared that in Milwaukee, Wisconsin, the Western Union Telegraph Company had its offices in the Chamber of Commerce Building, and the plaintiff, Lippert, was in its employ as a check boy. The only passageway for him and his coemployees to and from the office and operating room of the telegraph company, was through a door opening into a hall about twenty feet wide, and the entry to the elevator in the building was from this hall. The Crane Elevator Company, the defendant, under a contract with the owner of the building, took down the elevator and replaced it with a new one, and became the owner of the material of the old elevator under its contract, and it piled this material on the side of the hall adjoining the room occupied by the telegraph company, about five or six feet from the door leading into the office, and let it remain there about two weeks without any guard rails around it. About 1 o'clock in the morning the plaintiff, Lippert, while in the performance of his duties as the employee of the telegraph company, ran against this pile of material in the hall, and was injured, and brought suit against the elevator company. It was not shown that the owner of the building consented to the elevator material being placed in the hall, or that he knew it, but it had been there long enough to charge him with notice. The plaintiff, Lippert, had been in the employ of the telegraph company for about two years before the accident, and knew the material was piled up in the hall. He recovered judgment against the elevator company who appealed. It was contended by the elevator company that no contract relation existed between it and Lippert, and that in the absence of privity of contract there was no duty existing between it and Lippert; and further that the remedy which Lippert might have had against the

owner of the building, or the telegraph company, did not extend to a recovery against the elevator company.

The court held: ''That the owner of a building occupied by a tenant owes him and those employed by such tenant the duty not to expose them to a dangerous condition which reasonable care on his part would have prevented. The telegraph company, and those employed by it, had a right to the use of the hall, for all lawful purposes, free from dangerous obstructions, so far as ordinary and reasonable care could provide against them. It acquired this right as an incident of its tenancy, and the right also inured to the benefit of its employees and servants. . Neither the owner of the building, nor another by his authority, had the right to place an obstruction in the hall which would endanger the safety of those having lawful occasion to pass through it while in the exercise of due care. If the plaintiff in error placed the obstructions complained of in the hall under a grant of authority from the owner of the building, its duties and responsibilities were coextensive with those of its grantor. If it placed the obstructions in the corridor without the consent of the owner of the building, its responsibility to the defendant in error for his injury would assuredly be no less than if it had acquired such consent.''

In the course of the opinion the court says: ''The defendant in error, as the employee of the telegraph company, had the right to use the hall for the purpose of travel to and from his place of employment, free from dangerous obstructions, as against the owner of the building or his licensee, as well as against one obstructing it without any claim of right.'' The court distinguishes Winterbottom v. Wright.

But we need not look beyond our own decisions for the principle applied by the circuit court in trying this case. In Geismann v. Electric Company, 173 Mo. 654, the plaintiff's husband was a laborer whose duty it was to hang signs or remove them from buildings in

different parts of St. Louis for the Schurk General Iron Works. He was sent by his employers to remove a sign on North Broadway. The defendant was a lighting corporation engaged in furnishing light and electric power to consumers in said city. It was alleged that defendant had carelessly permitted its electric wire on said building, by which it furnished light to the occupants thereof, to get out of repair and the insulation thereof to be worn off, and in removing the sign a loose wire, by which it was attached to the building and which was being handled by plaintiff's husband, came into contact with the defectively insulated wire, and in consequence plaintiff's husband was shocked and fell to the sidewalk, and was killed. It was contended the defendant was under no contract with plaintiff's husband for keeping its wires safe, and, therefore, that his widow could not recover, but this court held that plaintiff's husband was where his lawful business called him when he received the shock, and defendant owed him the duty to exercise ordinary care and foresight in keeping its wires safe; that it was bound to know that sign hangers, painters, carpenters and others would be required, from time to time, in the pursuit of their business, to come in proximity to its said wires, and was liable for its negligence in failing to keep them in repair.

Without citing any more cases announcing the same principles, we think it is clear that the plaintiff's husband was where his duty called him at the time he came in contact with the pipe of defendant; that it was a dangerous contrivance, placed as it was within five inches of the west rail of the track; that it was negligence in the railroad company to permit such a pipe to be placed so near to its track, thereby endangering the lives and limbs of its employees, and that it was equally negligent in the defendant Oil Company to place it there; that the defendant was bound to know and did know that the employees of the company in the

exercise of their daily avocation were liable to be struck by said pipe, and that it owed them the duty in the circumstances not to imperil their lives by constructing such pipe so close as to endanger the employees whose duty it was to operate the trains on said railroad.

This case falls clearly within the principles announced in Ella v. Boyce, 70 N. W. 1106. As said in that case if the defendant placed this obstruction there without the consent of the railroad, or maintained it there after it was notified by the railroad company to move it back, its responsibility to plaintiff's husband for his injury was no less than if it had obtained consent. If it did so with the consent of the railroad, then both the railroad and defendant were liable for such negligent obstruction, but the fact that the railroad owed its employees the duty of not subjecting them to such a dangerous obstruction in no manner excuses defendant for so placing it by consent of the railroad company.

The defendant cannot escape from its liability because it had no contractual relation with plaintiff's husband. The defendant was bound to apprehend that as a natural consequence of its act, the plaintiff's husband and other employees on the railroad trains would be placed in a situation of danger from said pipe and it must be held responsible for its failure to exercise care and caution commensurate with the danger that would naturally result from its want of care. Its liability does not depend upon any contract relation.

II. Notwithstanding the pipe was in dangerous proximity to the railroad track on which plaintiff's husband was engaged in managing and moving its trains, was plaintiff's husband guilty of such contributory negligence as will prevent a recovery by plaintiff? It is insisted that, because Young knew or must have known the pipe was there, he knew the danger of attempting to climb down on the side; that in so doing he

elected the most dangerous and unnecessary method of doing what he had directed his brakeman to do.

Unless the evidence tending to show plaintiff's husband was guilty of contributory negligence was such that all reasonable men would draw the same inference from his conduct and so viewed he was guilty of such negligence as contributed directly to his death, then it was a question for the jury.

In considering this point the character of the obstruction itself must be kept in view. It was not a bridge, house, or other large and at all times apparent object, but instead was a small metal pipe suspended in the air and in a place which by reason of the curves in the track of the railroad would not be readily seen by one busily engaged in the performance of his duty requiring his constant attention. Mr. Sebastian, the superintendent of the railroad, explains the deceptive nature of the pipe, and that it could not be seen by a man on a car with two cars ahead of him as the facts attending the accident disclosed was Young's position, and that the curves in the track were well calculated to deceive a person as to its distance from the side of the switching train; that he was himself deceived as to this, and had testified before the coroner's inquest that there was a clearance of from eighteen inches to two feet between the end of the pipe and the cars, but subsequently on measurement he discovered the end of the pipe was only four inches from the side of the cars. It is true that he testified that when defendant came to work on this part of the railroad he told him to look out for that pipe; that it was too close, and that he had notified Mr. Biggs, defendant's employee, to move it.

He did not testify he ever showed it to him or was ever with him right at the pipe. It appears, moreover, that plaintiff's husband had only been at work for the railroad company about a week before he was killed. In measuring his conduct under the circum-

stances, we are not to lose sight of the perilous nature of his employment and the work of uncoupling his cars which was his immediate concern at the time, requiring both his hands and eyes, and the short time in which he had to familiarize himself with the road and its environments. Taking all these things into consideration we think the circuit court was not authorized to declare he was guilty of such contributory negligence as a matter of law as to preclude a recovery by plaintiff, his widow, but that was a question for the jury in the light of all the surrounding circumstances. [Cambron v. Railroad, 165 Mo. 560-1; Hamilton v. Rich Hill Mining Co., 108 Mo. 364; Hollenbeck v. Railroad, 141 Mo. l. c. 110.]

## III.

No point is made in this court as to the instructions given on behalf of plaintiff as to the amount of the verdict. The verdict was for $5,000. The plaintiff's husband was in his 35th year when killed and earning $40 a month. He was a man of sober habits and industrious. The probabilities of life considered, we think the damages allowed were in no sense unreasonable.

The judgment is affirmed. *Burgess, J.,* concurs; *Fox, J.,* having presided on the circuit, took no part in the hearing of this appeal.