SADIE D. MANN, Plaintiff, Appellant, v. GRIM-SMITH HOSPITAL AND CLINIC, Defendant, Respondent.—147 S. W. (2d) 606.

Division One, February 14, 1941.

*L. E. Atherton* for appellant.

*Clark, Boggs, Peterson & Becker, Howard B. Lang, Jr., William L. Nelson, Jr.,* and *W. C. Frank* for respondent.

HYDE, C.—This is an action for $10,000 for malpractice for failure to properly set and treat plaintiff's broken leg. At the close of plaintiff's evidence the court instructed the jury to find for defendant and plaintiff took an involuntary nonsuit. Plaintiff's motion to set same aside was overruled and the cause was dismissed. Plaintiff has appealed from this judgment of dismissal.

The facts hereinafter set out were shown by plaintiff's evidence. Plaintiff, 75 years old on November 13, 1937, fell and broke her left leg below the knee. A doctor from LaBelle placed the leg in a splint and took her to the defendant hospital, arriving about 9:30 P. M. She was first taken to the X-ray room where an X-ray of the leg was taken by Dr. Cramb, a member of defendant's staff. The evidence showed that the limb was too swollen to set until Monday. Dr. Cramb was assisted by Dr. George Grim, who pulled the leg while Dr. Cramb attempted to put it in place. No anesthetic was used and a cast was placed on the leg at the time. No further X-ray was taken at the time the leg was set. On December 11, X-rays were again taken and a new cast was put on in January. The second cast was taken off and plaintiff was discharged from the hospital January 29, 1938. Dr. Cramb gave no instructions as to the care of the leg at the time she was discharged from the hospital, merely saying, "A pretty good leg." After her discharge she sent for Dr. Cramb because she was suffering so badly with the leg. He called four different times to see plaintiff but did nothing except pull her leg. Plaintiff continued to suffer with her leg and it was still swollen at the time of trial. She could get around using a cane in her right hand and holding on to things with the left hand. Before her accident she was very active. Her leg is not straight now. Dr. E. E. Walcher took an X-ray of the leg on July 1, 1939. Plaintiff claims that these facts, together with the testimony of Dr. Becker, an osteopath, and the offers of proof made concerning his testimony were sufficient to make a jury case; and that the court erred in excluding these portions of his testimony.

The members of defendant's staff, who treated plaintiff, were licensed physicians of the Allopathic School. Dr. Becker said he had "been called upon to reduce fractures of the leg during the entire period of (his) practice, 13 years." He examined plaintiff for the first time in June, 1939. He also saw all of the X-ray pictures. He said that "the bones were not in proper apposition;" that there was "probably about an inch deviation;" that "the median line of the tibia (shin bone) was deviated . . . laterally out . . . about three inches below the knee;" that he could "by palpation or manipulation feel the edges of those bones;" and that this made "about two inches shortness" in the leg and caused soreness in it. Dr. Becker was asked to state the difference "in the method of reduction of fractures by you as an osteopath and the M. D.s;" and also "what textbooks are used by an osteopathic surgeon in the treatment of fractures." Objections, on the ground that it was immaterial "what osteopaths study," and that it was incompetent "to prove what the practices of one profession are by another profession," were sustained. The court said: "I don't think this man is competent to pass on whether or not this M. D. gave the proper treatment."

The following questions, objections, offers and rulings were thereafter made:

"Q. Now, Doctor, viewing those two pictures, would you say that plaintiff's Exhibits 8-a and 9-a (X-rays taken in the hospital while plaintiff's leg was in a cast) show a proper setting of that leg? Mr. CLARK: Now wait a minute, if the court please. I object to that. It is calling for an opinion and invading the province of the jury and it is not the proper way to prove it. There is no hypothesis as to the condition of the patient or anything upon which even a medical expert could base an opinion. Mr. ATHERTON: He is testifying, Your Honor, as an expert. Mr. CLARK: He hasn't qualified as an expert here. The COURT: The court is not clear on this particular thing, but it seems to me he can't be an expert in this case. How could he? . . . Mr. ATHERTON: We offer to prove that the method of reduction of fractures by an osteopathic physician and surgeon and by a medical physician and surgeon are the same; that they use the same textbooks and the methods of reduction as taught in the two schools are the same. We offer to prove all this by this witness. . . . The COURT: If this witness knows that, I will let him testify to it. . . . Mr. CLARK: May I ask a preliminary question? The COURT: Certainly. Mr. CLARK: Q. Are you a graduate of any medical school? A. No, sir. The COURT: Objection sustained. (Exception) . . . Mr. ATHERTON: Q. What is the proper method of reduction of fractures, Doctor, such as you have observed here? . . . Mr. CLARK: If the court please, I object to that for the reasons I have stated, the proper practice can only be determined by those learned in the medical profession and not by one who has been trained in some other

profession. I have the authorities on that. That is going right back to the same proposition. The COURT: You don't need any authorities on it. I think that is the law. The objection will be sustained. (Exception) . . . Mr. ATHERTON: We offer to prove that the methods of reduction of fractures as practiced by M. D.s and by osteopaths are the same in both schools; that the same textbooks and authorities are used by followers of both schools and that the witness will testify that over a long period of time he has practiced with M. D.s in this and similar fractures; that at all times their methods of reduction have been the same and that the X-rays here and the pictures here show that no proper reduction was made; that regardless of the condition of the patient a proper reduction could be made and should have been made by a follower of either school. Mr. CLARK: First, you don't mean to say that he ever treated this patient? Mr. ATHERTON: No. Mr. CLARK: I object, first, to the offer of proof on the ground that it is not responsive to the question and I object to it for the further reasons I have heretofore given. The COURT: The objection to the profert will be sustained. (Exception) . . . The Court, Mr. Atherton, is firmly of the opinion, in view of the evidence adduced from this witness on the matter of qualification that this witness is not competent to pass on the treatment given this woman by the other physician and I want that put in the record as the opinion of the court. There is no use wasting time on that.''

 Of course, as contended by defendant, ''in an action for malpractice a physician or surgeon is entitled to have his treatment of his patient tested by the rules and principles of the school of medicine to which he belongs, . . . and if he performs the treatment with ordinary skill and care in accordance with his system, he is not answerable for bad results.'' [21 R. C. L. 383, sec. 28; see also 48 C. J. 1118, sec. 104; Note 78 A. L. R. 697; Cazzell v. Schofield, 319 Mo. 1169, 88 S. W. (2d) 580; Grainger v. Still, 187 Mo. 197, 85 S. W. 1114.] However, these authorities show this does not mean that no testimony of a practitioner of one school is competent in a malpractive case against a practitioner of another school. In the Cazzell case (where an osteopath testified in a case against an M.D.), we reaffirmed the ruling of the Still case (where M.D.s were allowed to testify against an osteopath) that such a witness ''was competent to express his opinion as to matters of diagnosis and to testify to any scientific fact that ought to be known to every physician and surgeon of every school or system.'' [See Cook v. Moats (Neb.), 238 N. W. 529, 78 A. L. R. 694, citing and following the Still case; see also Longan v. Weltmer, 180 Mo. 322, 79 S. W. 655, where an M. D. was held competent to testify in a case against magnetic healers.]

A well reasoned statement of this qualification of the general rule is made in Swanson v. Hood (Wash.), 170 Pac. 135 (also a bone fracture case), as follows:

"The rule is not that a physician of another school is not competent to testify, but that a defendant's treatment is to be tested by the general doctrine of his own school, which is a very different thing; in other words, the standard of exclusion of evidence is not the school of the witness, but the premises of his testimony. If the premises from which he testified, that is to say, the criterions by which he measures defendant's treatment, are those of defendant's own school, the witness is not disqualified merely because he himself belongs to another school. . . . When it once appeared that the osteopathic physician was basing his testimony on the tests of appellant's own school, his testimony was admissible; its weight was for the jury."

It is apparent in this case that the trial judge took the position that Dr. Becker could not qualify as an expert in this case solely because he was not a graduate of any medical school. In so ruling, the court disregarded the ruling in the Still case that if "it should appear that both the schools to which the witness and the defendant belonged employed the same treatment," to the condition under consideration, testimony as to propriety of treatment would be competent. It is, of course, no ground for exclusion of the testimony of an expert witness to say that a question calls for an opinion or conclusion or invades the province of the jury, so long as the question does not call for a conclusion of law. [Cole v. Uhlmann Grain Co., 340 Mo. 277, 100 S. W. (2d) 311, l. c. 322, and cases cited.] As to how similarity of methods might be shown, the Washington case, Swanson v. Hood, said such testimony "is admissible, though it be based on the study of books rather than on his own experience." Here the plaintiff sought to show "that the methods of reduction (of fractures) as taught in the two schools are the same, "not only from Dr. Becker's study of books, but also from experience gained over a long period of time he had practiced with M. D.'s in this and similar fractures;" and furthermore, "that the same textbooks and authorities are used by the followers of both schools" as to treatment of fractures. Whether or not the witness did know what he purported to know was of course another matter, which could only go to its weight if he made a prima facie showing of qualifications. He was not even allowed to show what his qualifications were by stating what his experience and study had been. Neither was he permitted to testify as to what was shown by the X-rays taken by defendant when plaintiff was in the hospital with her leg in a cast; and the basis of objections and rulings did not go to his qualifications to understand and interpret X-rays. Plaintiff points out that our statutes require an M. D. to study and pass examinations on anatomy, physiology and surgery (Sec. 9113, R. S. 1929, 7 Mo. Stat. Ann. 5075); and also make these requirements for an osteopath (Sec. 13516, R. S. 1929, 11 Mo. Stat. Ann. 7519). Other similar studies are required of both. Certainly reduction of fractures is a very different matter from the treatment of disease

354

by medicine. It does not seem unreasonable that the study and methods of the two schools would be the same in many respects as to treatment of fractures. Even a layman has some idea about what must be done. We hold that it was erroneous to refuse to permit the witness to show his qualifications and to show the extent of similarity of study and methods of these schools.

The judgment is reversed and the cause remanded. *Bradley* and *Dalton, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.