**CENTRAL & SOUTHERN TRUCK LINES,**
Inc., a Corporation, Respondent,

v.

**WESTFALL GMC TRUCK, INC., a**
Corporation, Appellant.

No. 22790.

Kansas City Court of Appeals.

Missouri.

Nov. 3, 1958.

Benjamin W. Morse, Kansas City, William B. Waters, Liberty, for appellant.

Karl F. Schmidt, Morrison, Hecker, Buck, Cozad & Rogers, John R. Gibson, Kansas City, for respondent.

HUNTER, Judge.

This is an appeal by defendant-appellant, Westfall GMC Truck, Inc., from a judg-

ment entered in accordance with the jury verdict in favor of plaintiff-respondent, Central & Southern Truck Lines, Inc., in the sum of $4,300 for damages to a trailer owned by plaintiff.

Plaintiff corporation is the owner and operator of a truck line. In connection therewith it owns and operates both tractor and trailer units. On some occasions, the entire unit, consisting of both a tractor and a trailer is operated over the highways by plaintiff. In other instances, the tractor unit is leased from someone else and only the trailer unit is provided by plaintiff.

On the occasion before us, only the trailer unit was owned by plaintiff. The tractor unit belonged to Harry Lasater. According to the evidence, in early February one of Lasater's diesel tractor units was in a wreck. It was taken by Lasater to defendant to be repaired. Several weeks after its delivery by Lasater to defendant, the engine in another of Lasater's trucks became disabled. This was prior to the time the repair job was completed on Lasater's first mentioned tractor, and Lasater instructed defendant to exchange the engine in the tractor already with defendant for repair with the engine which needed repair. In accordance with this instruction defendant did switch the engines, repaired the first mentioned tractor, and delivered possession of it to Lasater about noon on April 2, 1955.

This tractor unit was then driven by Lasater from defendant's garage located at 2534 McGee Trafficway in Kansas City approximately three miles over a route that included some rough streets and occasioned numerous turns including one as sharp as 125 degrees, to the H & H filling station where it was placed on the grease rack. There, according to Lasater, the transmission, oil level and crank case were checked, and possibly other similar work done. The tractor unit was then taken to plaintiff's loading dock at 17th and Wyoming Streets in Kansas City where it was hitched to the trailer owned by plaintiff, and it was loaded with a cargo of meat. The unit was not left unattended except for a brief time while its driver was eating lunch.

Later that afternoon Lasater and his driver, Randall Keyser, left plaintiff's loading dock with the tractor and trailer. They proceeded out of Kansas City to the Frogge filling station located on Highway 40 where the tractor unit received a load of fuel. At no time had Lasater detected any defects in the steering mechanism, nor had he examined its tie-rod.

Lasater left the vehicle at that point, and Keyser proceeded to drive easterly on Highway 40 for his destination, Gulfport, Mississippi. At a point on Highway 40 just a short distance west of Sweet Springs, Missouri, the tractor-trailer unit suddenly left the highway, went into a ditch, knocked down a tree and a pole, jackknifed and ended up in a field with the trailer lying on its side, extensively damaged.

It was plaintiff's pleaded contention that defendant negligently repaired the tractor unit in either failing to connect or by defectively connecting the tie-rod end to the steering apparatus on the tractor, and that as a result the driver lost control of the unit at the place where it left the highway and was damaged. With reference to this contention, Lasater testified on behalf of plaintiff that while his tractor was with defendant in its garage for the motor exchange and repair work he saw it there with the disconnected right end of the tie-rod on the floor of the garage, and saw that the tie-rod had been removed from its normal position on the vehicle.

The driver, Keyser, also testified on behalf of plaintiff. He stated that when a motor of the type in question is changed it is customary to drop the tie-rods in making the exchange. He also stated that immediately after the accident he noticed that the tie-rod was hanging straight back from the front end and parallel to the

frame of the tractor, and that the right end of the tie-rod had come off. In describing how the accident occurred Keyser stated that he was about to pass a car, changed his mind, applied his brakes, and immediately was unable to control the unit or steer the tractor-trailer. It proceeded out of control into the ditch, hit a tree and pole, and jack-knifed in the field. Plaintiff's exhibit No. 10 was received in evidence as the purported tie-rod end. It bore shiny marks on its bottom which both Keyser and Lasater explained as having been caused by its dragging on the concrete pavement. Two witnesses, Mr. and Mrs. Eugene Hurd, testified for plaintiff that they had been following the tractor-trailer down the highway in their car for several miles and noticed sparks coming from the pavement on the left side near the front. They saw the brake lights go on and the truck leave the highway and jack-knife. Mr. Hurd testified he saw the right tie-rod down after the accident.

F. J. Mitte, a safety engineer employed by plaintiff explained to the jury the purpose of the tie-rod assembly and how it controls the operation of the vehicle. He testified that in his opinion the accident was caused by the tie-rod end coming loose.

Sufficient evidence has been set out to permit consideration of defendant's principal contention; namely, that the evidence failed to show any privity of contract between plaintiff and defendant or any duty owed to plaintiff by defendant, and that the trial court thus erred in refusing to sustain a motion for a directed verdict for defendant at the close of all the evidence.

Thus, we have presented for the first time in this State the question of whether or not the doctrine announced by Justice Cardozo in the historical case of MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696, is to be extended to include not merely those who manufacture automobiles but also those who contract to repair them. In the MacPherson case the manufacturer of the automobile was held liable to a third person, the owner of the car who had purchased it from an independent dealer and who admittedly was not in privity of contract with the manufacturer, for his injury resulting from the collapse of a negligently constructed wheel of the automobile. Recovery was premised in tort on a duty found to be owed by the manufacturer to third parties to use due care not to injure them by a negligently constructed car that would be likely to injure others when put to its intended use. As Justice Cardozo stated it, 111 N.E. loc. cit. 1053: "If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger. Its nature gives warning of the consequences to be expected. If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without new tests, then, irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully."

The MacPherson decision became the generally accepted rule in this country, including Missouri. See, Willey v. Fyrogas Co., 363 Mo. 406, 251 S.W.2d 635; Parker v. Ford Motor Co., Mo.Sup., 296 S.W.2d 35; Young v. Waters-Pierce Oil Co., 185 Mo. 634, 84 S.W. 929; McLeod v. Linde Air Products Co., 318 Mo. 397, 1 S.W.2d 122; Casey v. Wrought Iron Bridge Co., 114 Mo.App. 47, 89 S.W. 330.

Thereafter, in jurisdictions other than Missouri, the question was presented as to whether or not the doctrine of liability in tort as announced in the MacPherson decision should be considered as covering injuries to third parties resulting from the negligence of the repairer of an automobile. Almost without exception those decisions extended the MacPherson case doctrine of tort liability to the automobile repairer. We proceed to set out some of those decisions.

In Moody v. Martin Motor Company, 76 Ga.App. 456, 46 S.E.2d 197, 200, the court had before it the question of the sufficiency of a petition alleging the defendant, who operated a garage and repair shop, had contracted with plaintiff-employer to repair the particular automobile in question and had negligently repaired the steering gear and brakes so as to leave the steering gear disconnected and the brakes inoperative with the result that plaintiff, driver of the truck, was injured when it swerved off the highway down an embankment. The court held that the petition did state a cause of action in tort and quoted with approval from Restatement of the Law of Torts, Secs. 403 and 404 as follows: " 'One who as an independent contractor makes, rebuilds, or repairs a chattel for another and turns it over to the other knowing that his work has made it dangerous for the use for which it is turned over is subject to liability as stated in §§ 388 and 390.' " Section 404: " 'One who as an independent contractor negligently makes, rebuilds or repairs a chattel for another is subject to the same liability as that imposed on negligent manufacturers of chattels under the rules stated in §§ 395–398.' " The court continued loc. cit. 200 of 46 S.E.2d: "As is seen from the foregoing the same liability which applies to a manufacturer applies to an independent contractor who repairs an article or machine."

In Zierer v. Daniels, 40 N.J.Super. 130, 122 A.2d 377, an action was brought against an automobile owner and one who was alleged to negligently have repaired its brakes for property damage and personal injuries sustained by plaintiff when defendant-owner drove the automobile into plaintiff's standing automobile. The court stated, 122 A.2d loc. cit. 378: "Under the prevailing rule today in other jurisdictions, in a case of misfeasance, he who repairs a chattel is bound to exercise reasonable care not to cause bodily harm or damage to one whose person or property may reasonably be expected to be endangered by the probable use of the chattel after the making of the repair. In such a case the obligation in tort is fastened to the repairman's acts quite aside from any obligation in contract. Under this rule, one who negligently repairs an automobile at the request of the owner has been held liable to a third person. (citations). * * * Prosser, Torts (2nd ed. 1955), 517. Prosser cites earlier contrary law, but dismisses it as 'now ancient history' ". * * * 122 .A.2d loc. cit. 379: "In our opinion the rule established by the authorities above cited is sound. The very paucity of reported cases on the subject, even in the jurisdictions adopting the rule, will serve to allay all apprehensions that such a rule might either increase or complicate auto accident litigation to a serious extent or place upon auto repairmen an enormous burden. We see no reason, then, not to give effect here to the strong principle of the law ordinarily requiring one who has committed an act of negligence to answer for its proximate consequences."

In Burkett v. Globe Indemnity Co., 182 Miss. 423, 181 So. 316, the charge was that the defendant motor company in repairing the automobile in question had negligently left a steering arm adjustment tool attached to the automobile so that the steering gear became inoperative when it came into contact with grease cups and that defendant company concealed that fact from the owners and plaintiff. A guest of the owner was injured while riding in the car with the owner when the steering gear failed to function and the car plunged into a ditch. In holding that a cause of action in tort had been alleged, the court stated loc. cit. 319 of 181 So.: "It may be said that an automobile is not inherently dangerous but the repair made on this automobile, and the condition in which it was alleged to have been knowingly delivered to the owner, with a concealment from him of such facts, rendered the automobile highly dangerous from the moment it was thus delivered to all who might come in

contact with it while it was in motion, whether as a guest riding therein or a pedestrian."

In Vrooman v. Beech Aircraft Corp., 10 Cir., 183 F.2d 479, the pilot of an airplane sued for his personal injuries sustained through the claimed negligent repair and inspection of an airplane by defendant at the owner's request. In permitting recovery the court cited the MacPherson case and stated loc. cit. 481: "Appellee insists, however that even though the MacPherson rule obtains in Kansas, it has not been extended to apply to a mere repairer, and that under the allegations of the complaint it stands in the position of a repairer, not a manufacturer. * * * We think under the complaint appellee stands in the position of a manufacturer as well as a repairer. But even so, the rule of liability has been made generally applicable to one who, as an independent contractor negligently makes, rebuilds, or repairs a chattel for another. (citing authorities) * * * The basis of liability is found in the law of torts, and the rules of negligence apply." For additional authority to the same general effect see 7A Blashfield, Cyc. of Auto Law, Sec. 5068; Hudson v. Moonier, 8 Cir., 94 F.2d 132, affirmed 8 Cir., 102 F.2d 96; Oliver v. Bercano, 267 App.Div. 747, 48 N.Y.S.2d 142, affirmed 293 N.Y. 931, 60 N.E.2d 134; Kalinowski v. Truck Equipment Co., 237 App.Div. 472, 261 N.Y.S. 657; Spolter v. Four-Wheel Brake Service Co., 99 Cal.App.2d 690, 222 P.2d 307; Jewell v. Dell, Ky., 284 S.W.2d 92; 65 C.J.S. Negligence § 101, pp. 638–639; 24 Am.Jur., Garages, Etc., Sec. 24, p. 491. 2 Restatement of the Law of Torts, Negligence, Sec. 404; Ibid. 1936 Pocket Supplement, p. 140.

It is our conclusion that we should follow the rule announced in these decisions which represent the weight of all the current authority on the subject, and which, to our minds, announces the sound and proper rule to be applied. We hold, that on the facts of this case, the trial court did not err in overruling defendant's motion for a directed verdict offered at the close of all the evidence for defendant's given reason that there was no privity of contract or duty existing between plaintiff and defendant. It is our opinion that plaintiff made a submissible jury case under tort law principles, and that privity of contract between plaintiff and defendant is not a requisite to recovery.

Next, defendant contends the trial court erred in denying defendant the right to file amended answers to certain interrogatories and thereafter in refusing to permit defendant to call an additional witness who would have been named in the amended answers. We set out the pertinent sequence of events involved.

This action was commenced on December 8, 1955. Interrogatories to defendant were filed on January 12, 1956, asking the names of all employees of defendant who worked on the tractor, and also asked defendant to "state what inspections, if any, were made on it * * *." These interrogatories were answered on February 24, 1956. In June, 1956, amended answers to these interrogatories were filed by leave of court. Five individuals were named in these answers. The plaintiff proceeded to take the depositions of all these men. The case eventually was given a "special setting" for trial on Monday, October 14, 1957. In their preparation for trial defendant's counsel, on the Friday prior to the Monday on which the case was to be tried, learned that there were two additional employees of defendant who had worked on the tractor and as it stated in its proposed amended interrogatory that "one Robert Huggins then and now an employee of the defendant had inspected said tractor." This additional information and the three new names were conveyed by telephone to plaintiff's counsel on Saturday, October 12, 1957, about 9:45 a. m. On Monday morning, October 14, 1957, when the case was called for trial, defendant's counsel asked leave of court to file the amended answer to plaintiff's interrogatories setting out the three new names. Plaintiff's counsel ob-

jected, stating that in June, July and September, 1956, it had taken the depositions of all those previously named by defendant, all of whom denied any knowledge of the matter, and that plaintiff would be prejudiced by permitting these new names now to be injected into the case. Defendant's counsel offered to have the case continued at its cost so plaintiff could take the depositions of these new named persons who defendant wished to call at its witnesses at the trial. The trial judge refused to grant leave to file the amended answers and to permit defendant to call Huggins to testify concerning his inspection. The trial judge wrote a memorandum opinion stating that defendant did not produce any evidence to account for the long delay between the time the interrogatories were answered and the date on which the names of the additional witnesses were secured; that the parties had at least two weeks' notice of the trial setting; that such amended answers should not be allowed to be filed on the date of trial unless there was a strong showing made by the party seeking to file them, and that there was no such showing in this case.

Plaintiff's counsel also objected because it had arranged for a truck driver who is on a "run" between Kansas City and Florida to be present and also for its witness, Mitte, from Caseyville, Illinois, to be present—that the case had been given a special setting because of the difficulty of assuring the attendance of these people, and that an offer to pay the costs of a continuance would not aid plaintiff in that respect.

The statutes relating to discovery provide that interrogatories shall be "fully" answered within 15 days after service "unless the court, on motion and notice and for good cause shown enlarges or shortens the time." Sec. 510.020 RSMo 1949, V.A.M.S. On a party's refusal to answer the court, among other things, can enter its order refusing to allow the disobedient party to support or oppose designated claims or defenses. Sec. 510.060 RSMo 1949, V.A.M.S. Supreme Court rule 3.19,

42 V.A.M.S., provides the named penalties "may in the discretion of the court be applied in case of refusal of any such person to make discovery under this code."

■ The primary purpose of interrogatories is to aid the litigants to find out *prior to the trial* what the facts are, so that controversial issues can be ascertained and the preparation for trial and the trial limited to them all to the end of obtaining substantial justice between the parties litigant. Silver v. Westlake, Mo.Sup., 248 S.W.2d 628, 634; Gerber v. Schutte Investment Co., 354 Mo. 1246, 194 S.W.2d 25. It is possible for this purpose to be just as completely circumvented by a failure to fully answer a proper interrogatory as by a failure or refusal to answer.

■ To allow defendant, as here, to answer an inquiry concerning the identity of key witnesses and then to allow a twenty month period to lapse, with a request, not supported by a sound and compelling showing of just cause, to file amendments on the day of trial disclosing new key witnesses obviously would prejudice plaintiff in its preparation for trial. Nor can we say as a matter of law that under the circumstances shown a continuance would be fair to plaintiff and appear to offer a reasonable solution in view of plaintiff's problem of again securing the attendance of his out-of-state and other witnesses. In any event, the trial judge is to be accorded a broad and sound discretion when called upon to pass on this type of problem, and we find no abuse of that discretion by his refusal to permit the out-of-time filing of the amended answers to the interrogatories and his refusal to permit a newly named person therein to testify. Cf. Newsum v. Pennsylvania R. Co., D.C., 97 F.Supp. 500, 502; Silver v. Westlake, supra; Franklin v. Franklin, en banc, 365 Mo. 442, 283 S.W.2d 483–486.

Actually, although not mentioned in the briefs of counsel, Huggins did testify as a witness. He did not testify concerning any inspection of the tractor that he may have

made. While no explanation of this appears in the record, we have given defendant the benefit of the matter and have assumed for the purpose of this opinion that the court's previous ruling prevented Huggins from testifying on that particular subject.

■ Nor do we find any merit in defendant's contention that the interrogatory called for "hearsay." Defendant undertook to answer it but did not do so fully. Defendant did not file any objections to the interrogatory in the trial court or otherwise object to it in that court. See Sec. 510.020, subd. 3 RSMo 1949, V.A.M.S. Further as stated in State ex rel. Uregas Service Co., Inc., v. Adams, en banc, 364 Mo. 389, 262 S.W.2d 9, 11: "* * * An officer * * * 'is answering [interrogatories] for the corporation and not for himself', and it is immaterial that he does not know of his own knowledge the facts required to be stated. * * * We hold that material information not privileged which the corporation has must be given when obtained by any of its officers, agents or employees, including its attorneys."

■ Defendant also argues that the word "inspection" does not include the casual observation of Huggins but means only the final and formal inspection that is given to a tractor. In its brief defendant says: "One of defendant's shop foreman, Robert E. Huggins, in looking for work to parcel out * * * had casually looked over the tractor in question and had noticed the right tie-rod end was in place and bolted down with cotter key in place." Evidence in the case indicates that it is necessary to get under the truck in order to see the mentioned tie-rod and cotter key. A fair reading of the interrogatory does not call for such a narrow construction of it as defendant suggests. It is apparent that plaintiff's interrogatories included a request for the names of those employees of defendant who worked on the tractor, and those who actually examined it or looked it over sufficiently during its repair time as to have observed the controversial condition and position of its tie-rod, and who thereby would be expected to have relevant information and be qualified to appear as witnesses on that subject at the trial. Defendant must have thought the interrogatories were subject to that interpretation or it would not have believed there was any necessity for it to file the proposed amendment to them. We rule this contention of defendant to be without merit.

■ Defendant next contends the trial court erred in receiving in evidence plaintiff's exhibit No. 10, alleged to be the right tie-rod end removed from the tractor. Witness Lasater was asked: "Did you see the right tie-rod end on the particular vehicle involved in this accident at the scene of the accident? A. Yes, sir. Q. Is this that tie-rod end? A. It looks like it. Q. Are there any identifying marks or characteristics by which you can tell whether or not that is the same tie-rod end? A. Well, it has the same appearance as the one we examined that night, because of the ground off condition of the bottom of the tie-rod end." On cross-examination he testified that it had not been in his custody since the accident and that he couldn't say "with certainty" that it was the same one. Plaintiff's exhibit No. 8, admitted into evidence without objection, was a picture of the wrecked tractor taken shortly after the accident, and it showed the tractor's tie-rod. Later, Witness Keyser testified that the exhibit (also referred to as exhibit J) was the tie-rod that he took off the vehicle right after the accident. In view of all this testimony we find no merit in defendant's claim of material error in admitting the exhibit into evidence. See Farmers' & Merchants' Bank of Springfield v. Zook, 133 Mo.App. 603, 113 S.W. 678; Connor v. Wabash Railroad Co., 149 Mo.App. 675, 129 S.W. 777; Stallman v. Robinson, 364 Mo. 275, 260 S. W.2d 743, 749–750.

Defendant next contends that the trial court erred in permitting plaintiff's witness, Mitte, to testify as to his opinion of the cause of accident for the sole assigned reason that "it's invading the province of the

jury." . We will summarize some of the pertinent evidence touching this subject. Plaintiff's witness, Hurd, testified that he and his wife in their car followed the tractor trailer for the last 7½ miles before its accident and observed it as it left the highway and went into the ditch and field. He noticed that sparks were coming out from underneath the front left portion of the tractor (at about the tie-rod location) for a considerable distance immediately prior to its being wrecked. Immediately after the accident he inspected the tractor with the driver and discovered that the tie-rod end was not connected. He further testified that when the accident occurred the tractor trailer was on its proper side of the highway, that the brake lights flashed on and it just "shot into the ditch". Mrs. Hurd testified to substantially the same facts except that she did not go over to the wrecked tractor to observe the tie-rod.

Witness Lasater testified that he was notified of the accident immediately after it happened, got into his car and drove as fast as he could to the scene. He identified plaintiff's picture exhibit No. 7 admitted into evidence which was taken to show the tie-rod of the tractor "in the position that we found it." He was present when the tie-rod was taken from the truck to preserve it as evidence and spent about 30 minutes on the scene examining it. He was permitted to testify without objection that if the tie-rod end was or became disconnected from its normal position on the right steering arm of the right front wheel that normally one would lose control of the steering of the right wheel. When an additional question was asked, defendant's counsel objected "you are asking him as to what the truck might do with this tie-rod down and that is a question which requires special knowledge on the part of the person answering it; one who has special knowledge of the mechanics of a truck, the effect of the steering of a tie-rod end being down." The court sustained this objection. Later defendant's counsel introduced defendant's exhibit No. 11, which purported to be the assembly of a tie-rod on a 1951 GMC truck of the exact model of the one involved in this accident. Defendant's counsel then proceeded to ask Lasater if he was familiar with how a tie-rod end is hooked up with the steering mechanism on a GMC diesel truck and on Lasater's affirmative reply defendant's counsel proceeded to have Lasater, with the aid of exhibit No. 11, demonstrate to the jury the various parts, connections and functions of the tie-rod assembly and connecting steering parts. He had Lasater demonstrate just how the tie-rod nut must be placed and further secured with a cotter pin in order for the unit to be properly and safely assembled. He testified that the cotter key is to secure the nut and to keep it from loosening; that vibration could cause the nut to loosen if there were no cotter key. Lasater then testified, without objection, that from his examination of the vehicle, at the wreck and thereafter, he did not discover "any other defect, mechanical defect, which would cause an accident of this kind other than the right tie-rod end coming down." He was asked: "And if this left tie-rod or right tie-rod end came down then state to the jury what would happen to this rod and the assembly on the end of it. A. If the truck was moving it would drag back from the left connection." Further, that the entire assembly would swing around so as to be in the approximate position as shown in picture exhibit No. 10 taken at the scene of the accident; and that if the tie-rod end came loose it would hang down dragging on the pavement at an angle. Other witnesses, called on behalf of defendant, and who possessed expert knowledge on the subject, also testified concerning the purpose and functioning of a tie-rod such as the one in question and stated that the cotter key was necessary as a safety device to keep the nut from working loose from vibration or strain as the tractor moved down a highway. Defendant's witness, Fox, a mechanic, stated that if the right tie-rod end would drop off and the vehicle had proper alignment it could run down the road an indefinite length of time—"it might even go for several

miles"—but that when something unusual occurred such as a severe bump or the application of brakes the tractor would go out of control. Fox testified that he went to the scene of the wreck, examined the tractor and the left tie-rod end and found it to be without a cotter key; that he did not find any other cause for the accident other than the right tie-rod end coming down except "I guess the man could have just drove it off in the ditch." He also testified the cotter key would not come out if it was properly placed. Nor could the nut come off if the cotter key was properly installed. Defendant's counsel then added: "Are there other causes, Mr. Fox, which might have brought about this accident other than this mechanical defect you saw in the right tie-rod? A. Yes, I suppose the driver could negligently just run into the ditch."

Defendant's witness, Trice, testified in answer to defendant's counsel's question that it would not have been possible to have driven the tractor the distance it went before the accident if the tie-rod nut were off it. On cross-examination he conceded in effect that if the assembly had been put together tight enough that it would lock itself enough to hold even though the nut was off, but that it might later work loose while the truck was en route. He was asked, "Q. And it is only when you apply the brakes that that wheel would go out of control and throw you into the ditch? A. Yes, sir. Q. And if this right tie-rod end came loose, that would be enough to force the truck in the ditch? A. That is right."

Defendant's witness, O'Dell, testified that the cotter key is put on the tie-rod end as a safety device to keep the nut from vibrating loose, and if the cotter key was not put there it would be possible for the nut to vibrate loose. He testified he was familiar with the effect of the driving of the truck with the tie-rod down, and that nothing would happen going straight away as long as you don't hit any rough places in the road or attempt to make any turns.

Returning to defendant's claim of error, the specific question Mitte was asked is, "Based on your experience and your investigation of the accident do you have an opinion as to the cause of the accident?" He answered that it was his opinion that the right tie-rod end came loose causing the wheel to be a free agent and the truck to go out of control off the road.

Thus, the uncontradicted evidence in the case adduced by both parties was to the general effect that if the tie-rod was not connected up or came loose while the truck was en route the truck would go out of control and change its direction. The truck driver had previously testified that the tie-rod had come loose causing the truck to go out of control. All Mitte's testimony added was his opinion based upon his described detailed examination of the truck at the scene and his described examination of the nearby roadway, combined with his technical knowledge of the subject, that the right tie-rod end had come loose causing the truck to leave the roadway.

Mitte had been qualified as a safety engineer, responsible for the safe operation of all the equipment of plaintiff company, and an expert on the mechanical function and operation of the steering and turning apparatus of large tractors such as the one in question. His experience included such things as membership in the American Society of Engineers and 13 years' experience with over-the-road equipment, and accident investigations involving such equipment, including the determination of the cause thereof. No objection to his qualifications is presented to this court.

He testified as an expert as to what would happen if the right tie-rod end came loose when the tractor-trailer was moving down the highway. He stated that the two wheels are kept in proper steering position by the tie-rod, and that if the tie-rod came loose while the truck was moving the tie-rod would fall into a dragging position allowing the right wheel to be an independent

agent. The wheel would follow the same course until the vehicle speeded up, made a violent turn or had its brakes applied, and that would cause the wheel to go one way or the other. He testified he found a furrow mark leading to the right front wheel which was at an angle, and that it had turned completely to the right and was pushing up dirt instead of turning. He also found some bright spots on the pavement where something had struck it every few feet. These observed and stated facts formed the basis for his expressed opinion. He demonstrated some of this with the aid of defendant's exhibit No. 11. His testimony as to what he found on his examination of the highway and the wrecked truck coincided with what he, and other witnesses, had stated would be the expected result if the tie-rod end was not connected. Based on what he had found on that examination, and his expert experience in such matters, he gave it as his opinion that the cause of the accident was the right tie-rod coming loose causing the truck to go out of control off the highway.

■ This opinion, we feel, aided the jury to grasp the significance of and relationship between these facts. It is our view that his expressed expert opinion did not improperly "invade the province of the jury." Cf. Metropolitan Ice Cream Co. v. Union Mutual Fire Insurance Co., 358 Mo. 727, 216 S.W.2d 464; Stephens v. Kansas City Gas Co., 354 Mo. 835, 191 S.W.2d 601; Sconce v. Jones, 343 Mo. 362, 121 S.W.2d 777, 782; 32 C.J.S. Evidence § 533b, page 238.

The applicable rule is stated by Judge Dalton in Stephens v. Kansas City Gas Co., supra, 191 S.W.2d loc. cit. 606, as follows: "As a general rule, a witness must state facts, from which the jurors are to form their opinion. 'But when the facts are all stated, upon a subject of inquiry, if an intelligent opinion cannot be drawn therefrom by inexperienced persons, such as constitute the ordinary jury, an exception is made to the general rule, and persons who, by experience, observation, or knowledge, are peculiarly qualified to draw conclusions from such facts, are, for the purpose of

aiding the jury, permitted to give their opinion. The exception is allowed from necessity. An expert witness, in a manner, discharges the functions of a juror; and his evidence should never be admitted unless it is clear that the jurors themselves are not capable, from want of experience or knowledge of the subject, to draw correct conclusions from the facts provided.' Cole v. Uhlmann Grain Co., 340 Mo. 277, 100 S.W. 2d 311, 322. An 'expert must possess knowledge from education or experience which will aid in ordinary jury in forming an opinion on the subject matter of the inquiry, when from common experience they could not do it correctly.' (citations.) It is 'not a valid objection to proper expert testimony that the question invades the province of the jury or calls for a conclusion of the witness, so long as it is not a conclusion of law.' Cole v. Uhlmann Grain Co., supra; Mann v. Grim-Smith Hospital & Clinic, 347 Mo. 348, 147 S.W.2d 606. 'An expert witness, necessarily, states his conclusions about certain matters which would not be permitted of other witnesses. As long as his opinion is not a mere guess or conjecture, but is based upon facts or adequate data, it is properly received.' Vitale v. Duerbeck, 338 Mo. 556, 92 S.W.2d 691, 695.'' In Sconce v. Jones, supra, our Supreme Court held, 121 S.W.2d loc. cit. 782: "Since plaintiff was an experienced truck driver it was proper for him to give his opinion or conclusions of fact, *concerning the cause of the truck leaving the road,* to the jury at the trial as an expert witness." (Italics ours.)

In our ruling we are not unmindful of the line of decisions culminating in Chester v. Shockley, Mo.Sup., 304 S.W.2d 831, 834, to the effect that a police officer may not give as his expert opinion that the point of impact of two automobiles is where the debris had fallen for the reason that such was not a proper subject for expert opinion evidence. The distinguishing feature is that in the case before us there is involved technical mechanical knowledge of the complicated function and operation of a large

tractor's steering parts, including knowledge of the proper method and procedure used in attaching a tie-rod to the steering mechanism. Also involved is an understanding as to what would cause that mechanism to fail to operate under stated conditions; what the result of such failure would be, and, as a corollary, from an examination of that mechanism and the roadway, what, if anything concerning that steering mechanism caused the tractor-trailer to go out of control and leave the highway. Ordinary jurors are not likely to possess such knowledge as contrasted with their general knowledge of the point of impact of two motor vehicles as demonstrated by the resultant debris.

Witness Mitte was asked if he had examined the books of plaintiff company concerning this particular trailer. He replied that he had. He was then asked, "What is the earning record from your examination of that trailer per month, net, to the company?" Defendant objected that "it is not the best evidence." On the trial court overruling the objection, Mitte stated, "About $350.00 a month," indicating this figure represented its gross earnings approximately the year preceding its having been wrecked, "but earned us more" in 1955 "less six per cent for administrative, is what we figure our trailer earns us." At that point defendant's counsel was permitted to examine Mitte, who testified that his position with the company through the years was such that every month the total gross business, the total expense of all departments, the total payroll, the total paid lease operators, the total paid for other expenditures came across his desk. He then testified, without objection, that $375 to $400 would be the loss of revenue for the 18 to 21 actual working days required to repair the damaged trailer.

The question objected to was such as to lead one to think that Mitte was being asked to give his answer based on his examination of books of the company. However, his answer as given and the explanation that he gave of it on further examination revealed that he was basing his statement as to the monthly net earnings of the truck on his personal knowledge of the subject gained by his position with the company over the years which called for pertinent company records bearing on that question to pass over his desk for his study, information and action; and, that, possibly also he got the same information or some of it from recent study of the company's records. At no time did he undertake to state the contents of any book or record or any part thereof.

In 32 C.J.S. Evidence § 792d, page 721, in speaking of the parol evidence rule it is said: "The rule does not apply to exclude parol evidence given by witnesses whose testimony is founded on their personal knowledge independent of the books; * * * also books of account are best evidence only of what the books contain, and it has been held that a party may explain, contradict, or supplement an account as shown by books by competent evidence. Parol evidence is admissible to prove matters where no record thereof was kept in books." In Miller v. Great American Insurance Co., Mo.App., 61 S.W.2d 205, 207, where the contention was that the records were the best evidence, the court said: "But plaintiff was not attempting to prove the contents of his books, records, invoices by oral evidence; rather he was attempting to prove the value of his stock of goods at the time of the fire. To the extent that his books, records, and invoices might have disclosed such value, he would have had two means of proof, one by his documentary evidence, and the other by his parol evidence. However, the fact that his documentary evidence would have been competent, if offered, did not thereby render his parol evidence of the same fact incompetent; and therefore the objection that the testimony of the witnesses was not the best evidence of the fact to be proved is not well taken. Rissler v. American Central Insurance Co., 150 Mo. 366, 51 S.W. 755; W. D. Schmidt & Co. v. Lightner, 185 Mo.

App. 546, 172 S.W. 483." See also Kinlough v. City of Maplewood, Mo.App., 201 S.W. 625, 628.

Thus, assuming that the question asked was improper, in view of the answer given and its explanation as to how witness Mitte obtained the information contained in that answer, we conclude that it was based on his personal knowledge of the subject. The fact that his study of certain records of the company also gave him part or all of that same information does not prevent his testimony when based on his personal knowledge. Certainly, no material error involving the merits of the action resulted from the trial court's ruling.

On this appeal defendant's counsel suggests this evidence was improperly admitted as unduly speculative. However, since this objection was not made at the trial, nor contained in the motion for new trial, it is not preserved for our review.

In Instruction No. II the jury is told in substance that the measure of damages is the difference in value of the trailer immediately before and immediately after the collision, plus the reasonable value of the lost use of the trailer for the period of time reasonably necessary to its repair. On this appeal defendant makes no objection to Instruction No. II. Instruction No. III instructs the jury that whether or not the plaintiff received any benefit from the repairs is not an issue in the case and not to be considered. Defendant objects to Instruction No. III on the theory it is entitled to have any such benefits deducted from any otherwise recovery of plaintiff.

Instruction No. II correctly set out the measure of damages as being the difference in the value of the trailer immediately before and immediately after the collision. Defendant tacitly recognized this as the correct measure of damages by not raising any objection to it on appeal. Plaintiff did not instruct on the theory it was entitled to recover the cost of its repairs necessitated by the accident. Benefits or lack of benefits from repairs later made plays no direct part under the theory of damages given in Instruction No. II. Defendant certainly was not entitled to have the value of any such benefits subtracted from the damages ascertained by computing the difference in the market value of the tractor immediately before and immediately after the wreck. While we do not approve the giving of Instruction No. 3 concerning benefits, we cannot see how under the facts of this case any prejudice could have resulted to defendant from it.

Defendant's last point is that a departure from the original cause of action resulted by the court allowing plaintiff to amend the petition at the close of the evidence.

The original petition alleged that the physical damage to the trailer was $5,112.24; that the loss of use damage was $5,000 and prayed judgment for $10,112.24. At the close of the evidence the court, over defendant's objection, permitted the petition to be amended to show that the trailer had a reasonable market value of $6,250 immediately before the accident, and of only $1,000 immediately after the accident, asking judgment for $10,250.

The amendment made conformed the petition to the evidence concerning the value of the trailer immediately before and after the collision. See Sec. 509.500 RSMo 1949, V.A.M.S. The fact it concluded with a prayer for $137.36 more than the original petition could not have been prejudicial in view of the original allegation of physical damage to the trailer being $5,112.24 and the jury verdict for all damage being only $4,300. Cf. Kearns v. Sparks, Mo.App., 260 S.W.2d 353, 357; Cramer v. Parker, Mo.App., 100 S.W.2d 640, 646.

Plaintiff had the right to instruct on the measure of damages as being the difference in the market value of the trailer immediately before and after the accident, and we find no merit in defendant's suggesting surprise or of its suggestion that plaintiff should have instructed on some other theory of computing damages that would be

more favorable to defendant's trial preparation. Cf. Hall v. Clark, Mo.Sup., 298 S.W. 2d 344, 350; Randall v. Steelman, Mo.App., 294 S.W.2d 588, 594; Thomson v. Bast, Mo.App., 309 S.W.2d 667, 670.

Because of the large number of cases cited by counsel for both sides in their excellent and comprehensive briefs, we have not attempted to refer to or to comment on all of them. We have examined them and have found nothing in them contrary to our expressed views.

It is the express mandate of the statute (V.A.M.S., Sec. 512.160, subd. 2) that no appellate court shall reverse any judgment unless it believes that error was committed by the trial court against the appellant that materially affected the merits of the action. Since our examination of the numerous points presented to us reveals no material error affecting the merits of the case, we affirm the judgment of the trial court. It is so ordered.

All concur